UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

v.

THRILLDEN GABRIEL HOLMES,

              Defendant.

_____/

CASE NO. 07-20472

DISTRICT JUDGE VICTORIA A. ROBERTS

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

## I.   RECOMMENDATION:

I recommend that Defendant Thrillden Gabriel Holmes' Motion to Suppress Evidence be denied.

## II.   REPORT:

### A.   Procedural History

Defendant Thrillden Gabriel Holmes was charged by Grand Jury Indictment, on September 25, 2007, with Conspiracy to Possess With Intent to Distribute and to Distribute Cocaine (Count I) and five counts of Possession With Intent to Distribute Cocaine (Counts II through VI). Counsel was appointed, and Defendant entered a not guilty plea on September 26, 2007. On November 19, 2007, Defendant filed a Motion to Suppress Evidence, challenging the seizure of evidence from his residence and his person. The motion was referred to the magistrate judge by Order of Reference on the same date. The government filed its Brief in Opposition to the motion on November 29, 2007.

The motion was brought on for hearing on December 17, 2007, January 25, 2008 and April 4, 2008. The motion was taken under advisement, and the parties were directed

to submit supplemental briefs. Defendant submitted his supplemental brief on July 1, 2008 (Document 63). The government filed its Supplemental Brief on July 21, 2008 (Document 68), and Defendant's reply to the government's submission was filed on July 30, 2008 (Document 71).

## B.    <u>Factual Record</u>

Defendant Holmes is one of five individuals charged in the conspiracy count. The instant Motion to Suppress is one of four filed in the case. In a Report and Recommendation of September 23, 2008 (Docket Entry No. 73), I recommended that the Motion to Suppress filed by Co-Defendant Cardell Clinton Campbell be denied. That report contains various findings of fact, each of which is incorporated into this Report by reference. On October 7, 2008, a second Report and Recommendation (Docket Entry No. 76) was submitted with respect to the Motion to Suppress filed by Co-Defendant Rodney R. Sierz. That report contained additional findings of fact, which are also incorporated into this Report by reference. On October 15, 2008, a third Report and Recommendation (Docket Entry No. 78) was submitted with respect to the Motion to Suppress filed by Co-Defendant Tracey Nelson. That report contained additional findings of fact which are incorporated into this Report by reference. In addition to the background information provided by my previous findings, the following paragraphs represent my further findings of fact as to the instant motion.[1]

---

[1] Each session of the evidentiary hearing resulted in a separate volume of transcript which are designated T1 (December 17, 2007), T2 (January 25, 2008) and T3 (April 4, 2008).

Following the seizure of a kilogram of cocaine from Defendant Cardell Campbell, Task Force Agent Donald Farris and Special Agent Brian Malagrida returned to their office to begin typing a search warrant for the Mendota address. Farris actually prepared the warrant request, using information provided by radio from other members of the task force. A utility check for 12666 Mendota Street was performed by Sgt. Mendosa, who provided Farris with the name "Threl" Holmes. (T2: 101-102 - Farris). A Department of Corrections record check indicated that Holmes had prior convictions for narcotics and related offenses. (Id. at 103). A Secretary of State records check was done on the license number of a white Cadillac which had been observed at the Mendota residence. That process revealed that the car was registered to Defendant Holmes at 12666 Mendota. (T2: 119-120 - Farris). Farris also received a report that a check of the license number of a Ford van parked at Mendota revealed that it was owned by Defendant Stewart. A Department of Corrections check as to Stewart also indicated convictions for either weapons and/or narcotic offenses. (T2: 103 - Farris).

Upon completion of the records investigations, Farris reviewed the information in his Affidavit with Assistant Prosecuting Attorney Karen Plant. He then proceeded to the 36th District Court and presented his warrant request to the duty magistrate. (T2: 103 - Farris). After the warrant was issued for the search of 12666 Mendota Street, Farris notified the crew and proceeded to that location. Upon his arrival, approximately 30 minutes later, he learned that the search had already begun. (T2: 104 - Farris). Corporal Rahn and his certified drug detection canine participated in the search. Farris testified that several kilograms of suspected cocaine, together with packaging material, and large sums of money were recovered in the search. (T2: 105 - Farris).

3

Special Agent Malagrida testified that approximately $172,000.00 in U.S. currency, nine and one-half kilograms of cocaine, six empty cocaine wrappings, documents relating to both Holmes and Stewart, firearms and drug distribution paraphernalia were recovered in the search. (T2: 217-219 - Malagrida).

On the afternoon of September 14, 2007, Officer Samuel Pionessa, a Detroit Police Department patrol officer, received a communication from the VCTF that a subject in a white Cadillac was wanted in connection with the distribution of narcotics. Pionessa testified that the task force requested a traffic stop. (T3: 40-41 - Pionessa). The task force representative instructed Pionessa as to where to intercept the subject vehicle (i.e. southbound Mt. Elliott from East McNichols). Upon observing the subject automobile, Pionessa observed that the driver was not wearing a seat belt. A traffic stop was initiated by Pionessa and Detroit Police Officer Martin, who was in a separate police vehicle. As Pionessa and Martin approached the stopped vehicle, Martin ordered the driver out. Pionessa was on the driver's side of the Cadillac, behind Martin. As the driver got out of the car, Pionessa observed a bulge on his right hip. He asked if the driver was armed, and received the reply "I have one on my hip." Pionessa thereupon recovered a loaded pistol from the driver, whom he identified in court as Defendant Thrillden Holmes. (T3: 41-42 - Pionessa).

### C.    Analysis

Defendant's motion seeks suppression of evidence recovered in both searches on September 14, 2007. First, he seeks to suppress all evidence derived by reason of the execution of the search warrant for his residence at 12666 Mendota Street, Detroit,

Michigan. Second, Defendant seeks to suppress as evidence against him a firearm seized from his person following the stop of his vehicle by Officer Pionessa.

Generally, a defendant bears the burden of proof on a motion to suppress evidence. United States v. Feldman, 606 F.2d 673 (6th Cir. 1979) cert. denied, 445 U.S. 961 (1980). A defendant seeking suppression must demonstrate a violation of some constitutional or statutory right in justifying that relief. Id. at 679 n.11. Once a defendant has made an initial showing that a search was conducted in violation of a constitutional or statutory right, the burden of proof shifts to the government to show that the search was reasonable. In any event, the burden of proof is by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 177 (1974).

### 1.    Search of Defendant's Residence Pursuant to A Warrant

The search of Defendant's residence at 12666 Mendota Street, Detroit, Michigan was performed in reliance upon a Search Warrant issued by a magistrate of the 36th District Court, at approximately 5:43 p.m. on September 14, 2007. Copies of the warrant and the Affidavit in support of its issuance were attached to Defendant's November 19, 2007 Motion to Suppress Evidence (Document No. 40), and are attached to this Report. "Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation. Mere affirmation of belief or suspicion is not enough." Nathanson v. United States, 290 U.S. 41, 47 (1933). "In order for a magistrate to be able to perform his official function, the affidavit must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." United States v. Smith, 182 F.3d 473, 477 (6th Cir. 1999). "The affidavit is judged

on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." <u>United States v. Allen</u>, 211 F.3d 970, 975 (6th Cir. 2000).

The Affidavit at issue in this case was submitted by Police Officer Donald Farris, and contains the following assertions of fact:

- Officer Farris was a member of the Detroit Violent Crime Task Force (VCTF).

    - VCTF is a multi agency task force made up of DPD (Detroit Police Department, MSP (Michigan State Police), ATF (Bureau of Alcohol Tobacco and Firearms), WCS (Wayne County Sheriff's Department), DEA (Drug Enforcement Administration), and FBI (Federal Bureau of Investigation). (¶ 1)

    - VCTF is responsible for investigating violent criminal activity occurring within the City of Detroit, Wayne County and the State of Michigan. (¶ 1)

    - Farris had been a police officer for seven years, and had experience in the investigation of violent crimes, including homicides, shootings, and gang and narcotics related crimes. (¶ 1)

- In August 2007, VCTF agents received information from a reliable confidential source concerning a drug distributor operating in Detroit, Michigan. (¶ 2)

    - The confidential source (designated "CS 1") had given information in the past that led to the seizure of drugs. (¶ 2)

    - CS 1's information was based on his/her own personal knowledge and observations. CS 1 reported that an individual known to him/her as "Skip" was distributing multiple ounce quantities of cocaine in Detroit, Michigan. (¶ 2)

    - CS 1 had known "Skip" for several years. (¶ 2)

    - CS 1 described "Skip" as a black male, approximately 45 years of age, 5' 9" tall, weighing approximately 160 pounds, and with braided hair. (¶ 2)

- CS 1 reported that "Skip" lived at 6700 Iowa Street, Detroit, Michigan, and that "Skip" operated a green Cadillac automobile. (¶ 2)

- CS 1 reported that he had been in contact with "Skip" within the previous 48 hours. (¶ 2)

- CS 1 reported that "Skip" informed him during their last conversation that he ("Skip") had kilograms of cocaine for sale at $25,000.00 per kilogram. (¶ 2)

- VCTF agents utilized public database searches to evaluate CS 1's information. (¶ 3)

    - Public databases revealed that Cardell Clinton Campbell resided at 6700 Iowa Street, Detroit, Michigan. (¶ 3)

    - VCTF agents from MSP obtained a driver's license photo of Cardell Campbell, together with his date of birth. (¶ 3)

    - Farris examined the photograph and observed the same physical characteristics as described by CS 1 for "Skip." (¶ 3)

    - During the previous week, VCTF agents met with CS 1 and displayed the photograph of Campbell. (¶ 3)

    - CS 1 identified the subject of the photograph as the "Skip" who was involved in cocaine distribution. (¶ 3)

- VCTF agents consulted a DEA intelligence database and criminal history records regarding Campbell. (¶ 4)

    - Cardell Clinton Campbell was listed in the DEA intelligence database with an alias of "Skip." (¶ 4)

    - The DEA intelligence database identified Campbell's address as 6700 Iowa Street, Detroit, Michigan. (¶ 4)

    - The DEA intelligence database reflected that Campbell was arrested for conspiracy to distribute cocaine, and was convicted and sentenced to 60 months in prison and 48 months probation in October 1999. (¶ 4)

    - Criminal history inquiry revealed that Campbell was convicted of cocaine possession and sentenced to two months in jail and two years probation following an arrest in February 1984. (¶ 4)

- Criminal history records revealed that Campbell was arrested for arson, in July 1985, and was subsequently found guilty and sentenced to six months in jail and two years probation. (¶ 4)

- Criminal history records revealed that Campbell was arrested for a felony weapons offense in August, 1988, and was subsequently found guilty of cruelty to animals and sentenced to one year probation. (¶ 4)

- Criminal history records revealed that Campbell was arrested in April, 1990, for possession of marijuana, and that he subsequently pled guilty and was sentenced to seventy days in jail. (¶ 4)

- Criminal history records revealed that Campbell was arrested in February, 1995, for felony homicide, but was subsequently found not guilty. (¶ 4)

- Criminal history records revealed that Campbell was arrested in April, 1998, for a felony weapons offense, but that the case was subsequently dismissed. (¶ 4)

- On September 14, 2007, VCTF initiated surveillance at 6700 Iowa Street based on information from CS 1 that Cardell Campbell would be distributing large quantities of narcotics on that date. (¶ 5)

  - At approximately 1:45 p.m., agents observed Campbell and an unidentified black female companion enter a green Cadillac bearing Michigan license number BHN 8371. (¶ 5)

  - The vehicle was registered to Alena Turner at 19301 Fenelon Street, in Detroit, Michigan. (¶ 5)

  - Agents observed that Campbell was wearing jogging pants with "Skip" on one of the pant legs. (¶ 5)

  - Neither Campbell nor his companion were carrying any items as they entered the vehicle. (¶ 5)

  - Campbell and his companion departed in the Cadillac. (¶ 5)

  - VCTF crews maintained tight surveillance and followed the vehicle to a house at 12666 Mendota Street. (¶ 5)

  - Due to traffic conditions, surveillance crews could not observe anyone leaving the vehicle at the Mendota address. (¶ 5)

- The green Cadillac remained at Mendota for approximately 3 to 4 minutes, at which time surveillance crews observed it backing out of the driveway and departing.  (¶ 5)

- Surveillance was maintained from Mendota to the point of a traffic stop initiated by Wayne County Sheriff's Deputies Lilly and Smith.  (¶ 5)

- Upon approaching the vehicle, Lilly observed that the driver appeared to be excessively nervous.  Lilly/Smith identified the driver of the vehicle as Cardell Campbell and the passenger as Quentisha Latrice Smith.  (¶ 5)

- A WCS canine unit was summoned to the scene.  (¶ 5)

- WCS Deputy Rahn and his certified drug detection canine "Chief" responded to the scene.  (¶ 5)

- The certified canine positively alerted for the presence of narcotics when exposed to the exterior of the vehicle.  (¶ 5)

- A search of the vehicle yielded approximately one kilogram of suspected cocaine hidden under the passenger seat.  (¶ 5)

- Both Campbell and his companion were arrested.  (¶ 5)

- DTE utility records and Michigan Department of Corrections records were consulted.  A DTE utility check of the address of 12666 Mendota revealed that utility bills for the residence were in the name of Threl Holmes, black male, born in 1972.  (¶ 6)

  - Michigan Department of Corrections records revealed that Holmes had convictions for felony narcotics and weapons offenses.  (¶ 6)

  - Holmes was convicted in 1990 for delivery of cocaine, 50-224 grams, and served ten years in prison.  (¶ 6)

  - Holmes was charged for possession of marijuana in 2002.  (¶ 6)

- A white Cadillac (Michigan license number BCY 5624) was observed to be parked in the rear of the driveway at 12666 Mendota Street.  (¶ 6)

  - Secretary of State records reflected that Threl Holmes was the registered owner of the vehicle.  (¶ 6)

- A white Ford Windstar van (Michigan license number BEE 6712) was parked in front of the 12666 Mendota Street address. (¶ 7)

  - The Windstar was registered to Matt Preston Stewart, black male born in 1965, of 19616 South Glen Boulevard, Brownstown Township. (¶ 7)

  - An OTIS check of Stewart revealed prior convictions and imprisonment for weapons and cocaine possession (225-649 grams) offenses. (¶ 7)

- At approximately 3:15 p.m., surveillance agents observed two black males exit the residence at 12666 Mendota. (¶ 8)

  - One subject moved the Ford Windstar (MI-BEE 7612). (¶ 8)

  - Both subjects then entered the Cadillac (MI-BCY 5624) and departed from the location. (¶ 8)

- Based upon Farris' experience, he knew that narcotics traffickers stored narcotics and proceeds in various culvert locations. (¶ 8)

In reviewing a state magistrate's determination of probable cause, his/her findings "should not be set aside unless arbitrarily exercised."  United States v. Pelham, 801 F.2d 875, 877 (6th Cir. 1986), cert. denied, 479 U.S. 1092 (1987).  Rather, the warrant should be upheld so long as the "magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  Id., at 877-78.

> "A grudging or negative attitude toward warrants" . . . is inconsistent both with the desire to encourage the use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusions upon interests protected by the Fourth Amendment is less severe than otherwise may be the case . . ..  A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

Massachusetts v. Upton, 466 U.S. 727, 733 (1984) (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965)).

> "We give the magistrate judge's decision to issue the warrant . . . great deference, . . . determining whether the magistrate judge 'had a substantial basis for finding that the affidavit established' a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place."
>
>     \*          \*          \*
>
> This requires 'a nexus between the place to be searched and the evidence sought.'
>
>     \*          \*          \*
>
> 'In other words, the affidavit must suggest that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of the property is suspected of crime.'

<u>United States v. Kenny</u>, 505 F.3d 458 (6th Cir. 2007).

Defendant Holmes challenges the evidence obtained from the search of his residence on three bases: (a) that the affidavit in support of the request for search warrant was so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable; (b) that the government's reliance upon the warrant was not in good faith or objectively reasonable; and (c) that the government failed to prove that the warrant was signed by a detached and neutral magistrate. I find no merit in any of his arguments.

Initially Defendant argues that the Affidavit is void as to the confidential source's credibility, history and reliability. Under such circumstances, Defendant maintains that an Affidavit must contain substantial independent police corroboration. Holmes asserts that, in the instant case, "[t]here is very little police corroboration, and any corroboration by the police is benign at best." None of the defense arguments survives a careful review of the Affidavit.

While it is true that Officer Farris identified the confidential informant only by a numerical designation, that fact is hardly surprising. If a source were identified by name, or by other personal characteristics, any semblance of confidentiality would be lost. Failure to safeguard cooperating witnesses would quite obviously discourage persons with knowledge of criminal activities from coming forward. The resultant loss of actionable intelligence would seriously undermine legitimate investigative efforts, and thus undermine the public interest. While Officer Farris did not identify his source, he did inform the reviewing magistrate that CS 1 had given information in the past which led to the seizure of drugs. He further commented upon the informant's reliability by informing the magistrate that CS 1's information was based upon his/her personal knowledge and observation, as opposed to rumor, hearsay accounts or other less reliable sources.

It is important to note that Farris and the VCTF did not simply rely upon CS 1's history of information leading to drug seizures. Instead, the task force took affirmative steps to verify every significant factual element of the informant's account. The source advised that an individual known to him/her as "Skip" was distributing multiple ounce quantities of cocaine in Detroit, Michigan. He provided a physical description, vehicle type and color, and specific Detroit address for the suspect. All of those elements of CS 1's report were verified by the task force through public databases, DEA intelligence material and criminal history records. The information in those repositories corresponded closely to CS 1's report. Of particular note was Campbell's criminal history of arrest and conviction, in Detroit, Michigan, for possession of cocaine in 1984 and for conspiracy to distribute cocaine in 1999. That information certainly enhanced the credibility of the CI's report that Skip was involved in cocaine distribution. Defendant characterizes the agent's

corroboration as "benign at best." Even if that characterization is accepted with regard to Campbell's personal information, the same cannot be said of the seizure of a kilogram of cocaine from Campbell on the very day that Farris' Affidavit was submitted to the magistrate. That seizure completed the verification of every significant detail of CS 1's intelligence. Task force surveillance activity confirmed: (a) that the individual (Campbell a/k/a "Skip") identified by the informant; (b) left the address (6700 Iowa Street) reported by the informant; (c) in the vehicle (green Cadillac) described by the informant; (d) and was found to be in possession of the drug (cocaine) described by the informant; (e) in the quantity (kilogram) identified by the informant; and (f) on the day designated by the informant. Contrary to Defendant's characterization of such verification as "very little" and "benign," I consider it to be both substantial and highly incriminating.

Defendant Holmes next argues that Farris' Affidavit fails to establish a "nexus between the place to be searched and the evidence to be sought." (Defendant's Supplemental Brief, Page 8). Again, I disagree.

VCTF surveillance activity established that 12666 Mendota Street was the last location to which Campbell traveled prior to his arrest for possession of a kilogram of cocaine. Farris informed the magistrate that neither Campbell nor his companion were carrying anything as they entered the green Cadillac prior to their journey to Mendota. The Affidavit truthfully acknowledged that no agent actually observed activity by the occupants of the green Cadillac on Mendota Street, and accounted for that lack of observation. Even though no one observed activity by Campbell and/or his companion, common sense dictates that they would not travel to a location for no purpose whatsoever. Agents observed that Campbell remained at Mendota for only three to four minutes. Such brief

13

contacts are widely understood to be consistent with drug distribution activity, although not exclusively so. Utility checks on the 12666 Mendota address revealed that it was the address of "Threl" Holmes. A Department of Motor Vehicles check on a Cadillac automobile located at the address revealed that it was registered to Holmes. A criminal history check confirmed that Defendant had a significant history of unlawful drug distribution which resulted in a ten year custodial sentence. Also observed at Mendota was a Ford Windstar van registered to Co-Defendant Matt Preston Stewart. A criminal records check revealed that Stewart also had been found guilty of drug distribution activity. Task force surveillance agents observed two black males leave the Mendota residence. One subject moved the Ford Windstar, and both subsequently left in the Cadillac registered to Holmes. It is quite reasonable to conclude that the men observed were the owners of the two automobiles. Based upon his prior experience as a police officer, Farris informed the magistrate that narcotics traffickers are known to store drugs and proceeds in various covert locations.

I am satisfied that Farris' Affidavit established a "nexus" between 12666 Mendota Street and the evidence of drug distribution which Farris sought to recover. The nexus between a place to be searched and the items to be seized may be established by the nature of the items and normal inferences as to where a person would keep such items. United States v. Rosenbarger, 536 F.2d 715, 719 (6th Cir. 1976), cert. denied, 431 U.S. 965 (1977). "[A] magistrate is permitted to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of the offense." United States v. Davidson, 936 F.2d 856, 860 (6th Cir. 1991). A reliable informant had reported that Campbell would be involved in the distribution of kilo quantities of cocaine on the date

in question.  A kilogram of cocaine is an object of considerable size.  Neither Campbell nor

his companion departed his residence with anything in hand.  That they were found to be

in possession of a kilogram of cocaine only a short time after a brief stop at Mendota

suggests that they obtained the drugs from that location.  Campbell made no stops

between his departure from Mendota and his arrest.    Mendota is the residence of

Defendant Holmes, a convicted narcotics dealer.  His vehicle was observed parked in the

driveway.  A vehicle owned by yet another convicted drug dealer, Defendant Stewart, was

also parked in front of the Mendota house, even though he did not live there.  Surveillance

agents observed two black males leave the Mendota house and interact with both vehicles

and one another.  The convergence of three convicted drug dealers at Mendota, shortly

before one of them was found in possession of cocaine is at least suggestive of a joint

enterprise.  Farris' police experience revealed that narcotics dealers store drugs in covert

locations.  I am satisfied that a sufficient "nexus" between 12666 Mendota and evidence

of drug distribution was established.  I conclude that Farris' Affidavit established probable

cause to believe that Cardell Campbell went to the Mendota Street residence to pick up

cocaine.

Defendant Holmes' third challenge to the adequacy of the Affidavit relates to the

record checks performed to connect him to the 12666 Mendota Street address.  Defendant

correctly observes that Special Agent Brian Malagrida testified that Thrillden Holmes was

not identified until September 14, 2008.  Holmes is incorrect, however, in stating that his

identification occurred after the search warrant was executed.  Agent Farris' statement in

the Affidavit that "Threl" Holmes was the utility customer and owner of the Cadillac at the

Mendota address is obviously a misspelling of Defendant's first name.[2]  His suggestion, however, that the task force could not have gathered the utilities account and motor vehicle records based on the misspelling is entirely wide of the mark.   As pointed out in the testimony,[3] the government's brief, and in the Affidavit itself, the utility account and motor vehicle records checks were performed using the street address of the residence and the license number of the automobile.  Those data resulted in the association of the home and automobile to Mr. Holmes.   That Farris misspelled Defendant's first name is of no consequence, as there is no evidence that the government gained an advantage by the misspelling, or that the magistrate's finding of probable cause was affected by the error. The Affidavit is *prima facie* evidence that the task force had compiled utility account, motor vehicle ownership and criminal history records relating to Holmes prior to the issuance of the warrant.   There is not a shred of evidence that the information obtained does not precisely correspond to the Defendant Thrillden Holmes.  The defense argument is simply insubstantial, and should be rejected.

The Supreme Court has declared that "probable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983). Accordingly, the degree of certainty necessary to a finding of probable cause has been described as something less than a preponderance of evidence and something more than bare suspicion.  Greene v. Reeves, 80 F.3d 1101, 1105 (6th Cir. 1996).

---

[2]  T3: 128-129 - Malagrida.

[3]  T2: 119-122 - Farris; 210 - Malagrida.

> [P]robable cause is a flexible, common sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false. A practical, non-technical probability that incriminating evidence is involved is all that is required.

Texas v. Brown, 460 U.S. 730, 742 (1983).

> [J]udges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the factual and practical considerations of every day life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur.

United States v. Strickland, 144 F.3d 412, 416 (6th Cir. 1998).

The magistrate's determination that there was probable cause to search 12666 Mendota, Detroit, Michigan, must be given "great deference." United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991). The magistrate's finding should not be set aside unless it was arbitrarily made. U.S. v. King, 227 F.3d 732, 739 (6th Cir. 2000). This court is not to conduct a *de novo* determination of probable cause, but should only determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). Based upon my review of the Affidavit in this case, I am satisfied that the magistrate did have a substantial basis for a finding of probable cause, and that the issuance of the warrant should not be overturned.

Not only does Defendant maintain that the search warrant was issued in the absence of a showing of probable cause, he argues that the government's reliance upon the authority of the warrant was not in good faith or objectively reasonable. He cites United

States v. Frazier, 423 F.3d 526 (6th Cir. 2005) in support of his argument.  In <u>Frazier</u>, the Sixth Circuit considered a search warrant affidavit containing hearsay information from confidential informants, but containing no indicia of their reliability, and no evidence that the requesting authorities corroborated the information provided by them.  The Court of Appeals determined that, "[w]hen confronted with hearsay information from a confidential informant 'a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of circumstances for evaluating the impact of that information . . .."  <u>Frazier</u>, 423 F.3d at 532 (citing <u>United States v. Helton</u>, 314 F.3d 812, 819 (6th Cir. 2003)).  The court further observed that, "in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration."  <u>Id</u>. (citing <u>United States v. Woolsey</u>, 361 F.3d 924, 927 (6th Cir. 2004)).  <u>Frazier</u> has little application to the case at bar.  Task Force Agent Farris' Affidavit states that CS 1 had provided information in the past leading to the seizure of drugs.  He further informed the magistrate that CS 1's information was "based on his/her own personal knowledge and observations."  (Affidavit, ¶ 2).  Thus, the issuing magistrate had a basis for evaluating the informant's credibility.  That basis was substantially expanded by police investigation of the source's information.  The task force was able to verify every essential element of the informant's report relating to Campbell.  In addition, the Affidavit relates the activities of VCTF personnel who observed Campbell leave his home empty handed, and travel to 12666 Mendota Street, where he remained only 3 to 4 minutes, only to be found shortly thereafter in possession of a kilogram of cocaine.  Defendant Holmes was linked by government agents to 12666 Mendota by way of utility account records and Department of Motor Vehicles records relating to his vehicle, which was parked at the residence.  Police

also observed the vehicle of Co-Defendant Stewart parked in front of the residence. Persons leaving the house were seen to operate both of the vehicles. Finally, agents confirmed that Campbell, Stewart and Holmes were all prior convicted narcotics dealers.

This case is easily distinguishable from <u>Frazier</u> by the amount of factual detail presented in the Affidavit submitted to the magistrate. In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme Court held that the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good faith reliance on a search warrant that is subsequently held to be defective." The court declared, however, that the good faith exception would not apply in the following circumstances: (1) where the supporting affidavit contained knowing or reckless falsity; (2) the issuing magistrate wholly abandoned his or her judicial role; (3) the affidavit is "so lacking in probable cause as to render official belief in its existence entirely unreasonable;" or (4) where the officers' reliance on the warrant was neither in good faith nor objectively reasonable. 468 U.S. at 923. In the case at bar, there is no showing that the Affidavit contained knowing or reckless falsity. Nor is there any evidence that the issuing magistrate abandoned her judicial role. The Affidavit in the case at bar is not so lacking in probable cause as to render official belief in its existence entirely unreasonable. Finally, there has been no evidence suggesting that the task force's reliance on the warrant was neither in good faith nor objectively reasonable. The <u>Frazier</u> court observed that "the good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." 423 F.3d at 533 (citing <u>Leon</u>, 468 U.S. at 905). The clear answer in this case is "no."

In a final challenge to the search of his residence, Holmes argues that the government failed to prove that the warrant was signed by a detached and neutral magistrate. Holmes correctly cites hearing testimony in which Donald Farris admitted that he could not recall which magistrate actually issued the warrant. As a general matter, however, if a search is conducted pursuant to a warrant, the Defendant must show by a preponderance of evidence that the warrant is invalid. U.S. v. Richardson, 943 F.2d 547, 548-49 (5th Cir. 1991). Only then must the government present rebuttal evidence. Id. The government has, nonetheless, produced evidence in response to Defendant's argument. Attached to the Government's Supplemental Brief (Docket Entry 68) is the Affidavit of Millicent D. Sherman declaring that she reviewed the Search Warrant numbered 36-07-826500 in her capacity as a Magistrate of the 36th District Court in Detroit, Michigan, and that her signature appears at the bottom of the warrant, which she issued on September 14, 2007. I am satisfied that the Search Warrant in question was issued by a neutral and detached magistrate with full authority to authorize the search of Defendant's home.

## 2. Seizure of Firearm From Defendant's Person Following Traffic Stop

Defendant Holmes challenges the seizure of a firearm from his person by Detroit Police Department patrol officer Samuel Pionessa, following a traffic stop of the Defendant's vehicle. He correctly asserts that the government bears the burden of proof as to the constitutionality of a warrantless search or seizure. Chimel v. California, 395 U.S. 752, 762 (1969). The temporary detention of an individual during a police stop of a vehicle, regardless of the limited purpose or the duration, constitutes a "seizure" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware

v. Prouse, 440 U.S. 648, 653 (1979). The stop of an automobile is reasonable, however, if police have probable cause to believe that a traffic offense has occurred. Id.

The government presented the testimony of Officer Pionessa. He testified that, on the afternoon of September 14, 2007, he received a radio communication from the Violent Crime Task Force that a subject in a white Cadillac automobile was wanted in connection with the distribution of narcotics. Pionessa testified that the task force "asked for a traffic stop." (T3: 40 - Pionessa). The task force contact instructed Pionessa as to where to intercept the subject vehicle (i.e. southbound on Mt. Elliott from East McNichols). Pionessa undertook surveillance of the Cadillac, together with Detroit Police Officer Martin, who was in a separate police vehicle. (T3: 40-41, 53 - Pionessa). Officer Pionessa observed that the Defendant was not wearing a seat belt, and he effected a traffic stop. As Martin and Pionessa approached the stopped vehicle, Officer Martin ordered the driver out. Pionessa was on the driver's side of the Cadillac, behind Officer Martin. As the driver complied with Martin's order, Pionessa noted a large bulge on his right hip. He inquired if the driver was armed, and the latter's response was "I have one on my hip." Pionessa recovered a 9 mm. H & K Pistol, loaded with 1 round chambered and 11 rounds in the magazine, from the driver's person. He thereupon arrested him for carrying a concealed weapon. Pionessa positively identified Defendant Holmes as the driver from whom he seized the weapon. (T3: 41-42 - Pionessa).

The Defendant's motion argues that the court should reject Officer Pionessa's testimony as lacking in credibility. He advances five arguments in support of his position.

Initially, Holmes argues that the traffic stop of his vehicle was pre-planned, since Pionessa had seen no traffic violation by Holmes when he was initially contacted by the task force. Defendant maintains that, because the stop was pre-planned, it was simply a pretextual excuse for the vehicle stop. He asserts that no traffic violation actually occurred.

In <u>Whren v. United States</u>, the Supreme Court held that, where probable cause exists to believe that a traffic offense has occurred, the subjective intentions of the officer play no role in ordinary Fourth Amendment probable cause analysis. The court rejected "the idea that an ulterior motive might serve to strip the agents of their legal justification." 517 U.S. at 813. Even before <u>Whren</u> was decided, the Sixth Circuit held that, so long as an officer had probable cause to believe that a traffic violation had occurred, a resulting stop would be lawful regardless of what else the office knew or suspected about the traffic violator at the time of the stop. <u>United States v. Ferguson</u>, 8 F.3d 385, 391 (6th Cir. 1983), <u>cert. denied</u>, 513 U.S. 828 (1984). Case law since <u>Whren</u> has reaffirmed the proposition that an officer who has probable cause to believe a civil traffic violation has occurred may stop the vehicle regardless of his or her subjective motivation for doing so. <u>United States v. Akram</u>, 165 F.3d 452, 455 (6th Cir. 1999).

Holmes next argues that Pionessa's testimony should be rejected because he could not testify that he saw Holmes' unfastened seatbelt retracted into its receptacle. Defendant maintains that the best Pionessa "could conclude was that he **believed** there was no seat belt on Mr. Holmes." (Defendant's Brief, Page 12). Holmes maintains that Pionessa could not even say for sure that he observed a civil infraction.

The evidence is to the contrary. Pionessa stated several times that Defendant was not wearing a seatbelt. He based that conclusion upon the fact that he could not see a

shoulder restraint across Holmes' body from his vantage point. Significantly, the officer testified that he could not see a restraint across Defendant's shoulder even as he approached the vehicle on foot after the stop. The sworn testimony of the officer constitutes direct evidence that Holmes failed to comply with the seatbelt requirement. That evidence, if believed, is sufficient in law to establish the fact of the violation. It is important to note that there is no contrary evidence in the record. In the absence of contradictory evidence, I accept Officer Pionessa's testimony regarding his observations of Mr. Holmes.

Defendant next argues that Pionessa's recollection should be disregarded because he was unaware if his vehicle had a video recorder at the time of the vehicle stop. The officer testified that he believed DPD personnel were required to videotape traffic stops, but that he did not have information regarding the presence of video equipment in his car on the day in question. The government has informed the defense that no videotapes of the encounter between him and police exist. Holmes urges the court to consider that fact in assessing the credibility of the government witness. The defense has not offered direct evidence of a requirement for video equipment on police vehicles. Assuming that such a requirement exists, I reject the proposition that a failure to comply with it requires the rejection of eye witness testimony regarding police encounters with citizens. Officer Pionessa has offered his sworn testimony as to his activities and observations regarding this Defendant, and as to his reactions to those observations. In the absence of equally persuasive evidence in opposition to his testimony, I find no cause to reject his testimony.

Defendant next maintains that Pionessa's testimony should be rejected because his observations of Holmes were made from the second car behind the Cadillac. He correctly

23

notes the testimony that Officer Martin's car was between Pionessa's and his own. Pionessa did, in fact, testify that he observed Holmes through the rear and front glass of Martin's cruiser. Holmes, however, offers no persuasive evidence that the absence of a seatbelt could not be observed through windows from a car length distance away. Defendant also fails to rebut Pionessa's testimony that he made a consistent and confirmatory observation of no seatbelt as he approached Holmes' vehicle on foot.

Defendant argues that Pionessa's testimony was not corroborated by Officer Martin. Martin, however, was not called to testify by any party to the case. He was available to both the prosecution and the defense. As he did not testify, it is correct to say that he did not corroborate Pionessa. It is equally correct, however, to note that he did not contradict Pionessa's sworn testimony.

Defendant's last challenge to Officer Pionessa's account is based upon the testimony of Sgt. Mendoza. Defendant maintains that Mendoza testified to having followed Holmes' vehicle "for some distance" without observing any civil infractions. (Defendant's Brief, Page 13). The bulk of Mendoza's testimony, however, related to his surveillance of the Cadillac earlier in the day, and not at the time of the actual traffic stop. At the time Holmes was actually stopped, Mendoza testified that "one of my officers was behind him. I was following behind, and I was contacting dispatch to have them - - that we were following Mr. Holmes from a location where we had picked off some narcotics from individuals leaving." Mendoza admitted the intent to stop Holmes and the need to come up with a reason to do so. He testified, however, that the reason was observed by another officer, and not by himself. (T2: 86-88 - Mendoza). I do not find that his testimony contradicts the sworn account provided by Officer Pionessa.

The government submits that the stop of Holmes' vehicle was also fully justified as an investigative stop based on reasonable suspicion of drug trafficking. Reasonable suspicion, not probable cause, is required before a law enforcement officer may make an investigatory stop of a vehicle. United States v. Cortez, 449 U.S. 411 (1981). The Supreme Court has declared that reasonable suspicion is a less demanding standard than probable cause, and requires only some minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing INS v. Delgado, 466 U.S. 210, 217 (1984)). Reasonable suspicion is dependent upon both the content of the information possessed by the police and its degree of reliability. Both factors, quantity and quality - - are considered in the "totality of the circumstances - - the whole picture," that must be considered in evaluating whether reasonable suspicion exists. Cortez, 449 U.S. at 817. Law enforcement officers may legitimately consider ". . . modes or patterns of operation of certain kinds of law breakers." Id. at 418.

The government relies upon the "totality of the circumstances" concepts enunciated in Illinois v. Gates, 462 U.S. 213 (1983). The prosecution observes that the task force agents in the investigation of this Defendant were aware of his criminal record of conviction for drug distribution activities. They were aware of the seizure of a kilogram of cocaine from Defendant Campbell immediately following his brief visit to Holmes' residence. They were aware of the seizure of cocaine from Defendant Sierz, again following a brief encounter at 12666 Mendota Street immediately following the arrival of Defendant's Cadillac at that location. Shortly thereafter, Defendant Stewart's Ford Windstar van was surveilled to a location where agents watched him interact with the occupants of a red Dodge pick-up truck. Surveillance of that truck and its driver subsequently resulted in the

seizure of yet another significant quantity of cocaine from Defendant Nelson. (See Reports and Recommendations at Docket Entries 73, 76 and 78).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact finders are permitted to do the same - - and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

United States v. Cortez, 449 U.S. 411, 418 (1981).

It is not necessary that the officer actually performing an arrest have knowledge of all the facts and circumstances giving rise to probable cause. Rather, probable cause for arrest may be founded upon collective police knowledge. See, United States v. Calandrella, 605 F.2d 236, 246 (6th Cir. 1979), United States v. Killebrew, 594 F.2d 1103, 1105 (6th Cir. 1979), United States v. McManus, 560 F.2d 747, 750-51 (6th Cir. 1977), cert. denied, 434 U.S. 1047 (1978). The same principle applies to investigative stops based on reasonable suspicion. In the case at bar, Officer Pionessa became a participant in the Violent Crime Task Force investigation prior to his contact with Holmes. He was informed that the occupant of the white Cadillac was wanted in connection with the distribution of narcotics. Even in circumstances in which an officer has nothing more than a bulletin from another police organization that a person is suspected of a criminal offense, an investigatory stop of the subject would be constitutionally justifiable by objective reliance on the bulletin, so long as the police who issued it possessed a reasonable suspicion justifying the stop. United States v. Hensley, 469 U.S. 221 (1985). "[T]he evidence . . . collected must be seen and weighed not in terms of library analysis by scholars, but as

understood by those versed in the field of law enforcement." United States v. Cortez, supra. Viewing the totality of the circumstances known to the Violent Crime Task Force at the time Pionessa was requested to stop Holmes' Cadillac, I am satisfied that specific and articulable facts giving rise to reasonable suspicion of drug trafficking had been developed. Accordingly, Officer Pionessa's objective reliance upon the task force request for an investigative stop was sufficient to withstand a Fourth Amendment challenge. United States v. Hensley, supra.

In summary, I find that Officer Pionessa had probable cause to believe that Defendant Holmes had committed a traffic violation, and that the stop of his vehicle was justifiable on that basis. I further find that the Violent Crime Task Force, which issued the request for the stop of Holmes' vehicle, was possessed of specific and articulable facts constituting probable cause, and certainly reasonable suspicion, that the Defendant was involved in a drug trafficking crime. That information fully warranted an investigative stop of the Cadillac by Pionessa in reliance upon the task force broadcast that he was sought for drug trafficking. Under either theory, Officers Martin and Pionessa were fully warranted in requesting that the Defendant exit the vehicle following the stop. Pionessa testified that the information he had received regarding Defendant's suspected drug distribution activities raised concerns for officer safety, based upon his experience that drug dealers often carry weapons. Pionessa stated that Holmes was asked to get out of the Cadillac for reasons of officer safety. In Pennsylvania v. Mimms, 434 U.S. 106 (1977) the Supreme Court addressed a similar situation.

> Against this important interest we are asked to waive intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the

> order to get out of the car. We think this additional intrusion can only be described as *de minimus*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a serious intrusion upon the sanctity of the person, but it hardly rises to the level of a petty indignity. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

Pennsylvania v. Mimms, 434 U.S. at 111. In the process of Holmes' debarkation, Pionessa noticed a bulge on the Defendant's right hip. He quite reasonably asked if the Defendant was armed, and received an affirmative reply. Recovery of the firearm was, under the circumstances, the only reasonable course of action.

For all of the above reasons, I recommend that Defendant Thrillden Gabriel Holmes' Motion to Suppress Evidence be denied.

## III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981), <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>Howard v. Secretary of HHS</u>, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. <u>Smith v. Detroit Federation of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987), <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer
DONALD A. SCHEER
UNITED STATES MAGISTRATE JUDGE

DATED: November 4, 2008

---

## CERTIFICATE OF SERVICE

I hereby certify on November 4, 2008 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on November 4, 2008: **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217