UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff(s),**       CASE NUMBER: 07-20472
                                               HONORABLE VICTORIA A. ROBERTS

v.

**THRILLDEN GABRIEL HOLMES,**

        **Defendant(s).**
_____/

ORDER ADOPTING THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

**I.   INTRODUCTION AND PROCEDURAL HISTORY**

This matter is before the Court on Defendant Thrillden Gabriel Holmes's ("Holmes") "Motion to Suppress Evidence or in the Alternative for an Evidentiary Hearing."  (Doc. #40).  Magistrate Judge Donald A. Scheer granted Holmes's request for an evidentiary hearing.  An evidentiary hearing was held on December 17, 2007 and continued on January 25, 2008 and April 4, 2008.

Holmes asks the Court to suppress: (1) the evidence seized during a search of 12666 Mendota; and (2) the handgun seized by Officer Samuel Pionessa ("Officer Pionessa") of the Detroit Police Department ("DPD").

On November 4, 2008, Magistrate Judge Scheer issued a Report and Recommendation ("R&R") that recommends the Court DENY Holmes's motion.  He says: (1) the affidavit in support of the search warrant was supported by probable cause; (2) the affidavit established a nexus between 12666 Mendota and evidence of

1

drug trafficking; (3) the search warrant was signed by a neutral and detached magistrate; and (4) the agents' reliance on the search warrant was in good faith. Further, Magistrate Judge Scheer says Officer Pionessa had probable cause to believe Holmes committed a civil infraction. In the alternative, he says the investigatory stop was legal because Pionessa had reasonable suspicion to believe Holmes was involved in drug trafficking.

On November 25, 2008, the Court adopted the R&R because neither party filed objections within the time frame provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(3). (Doc. #92). On December 2, 2008, Holmes filed a "Motion for Extension of Time to File Objections." (Doc. #93). On December 4, 2008, the Court granted Holmes's motion to consider the objections filed on December 2, 2008. (Doc. #95).

In Holmes's "Objections to Magistrate Judge's Report and Recommendation," he says: (1) the confidential informant was not a credible source of information; (2) a sufficient nexus between 12666 Mendota and evidence of drug trafficking does not exist; (3) the search warrant was not supported by probable cause; (4) the search warrant was not signed by a neutral and detached magistrate; and (5) Officer Pionessa's testimony was not credible.

Holmes also says the Magistrate Judge omitted "factual findings" in the R&R. Some of those "factual findings" are reflected in the following section; others are omitted as irrelevant.

For the following reasons, the Court **ADOPTS** the R&R.

**II.    BACKGROUND**

### A. Surveillance of Co-Defendant Cardell Clinton Campbell and the Green Cadillac

Special Agent Brian Malagrida ("SA Malagrida") of the Drug Enforcement Administration ("DEA") received information from a confidential informant that Holmes's co-Defendant Cardell Clinton Campbell ("Campbell") was expected to conduct a large scale drug transaction on September 14, 2007. Surveillance began. Several vehicles were observed during this surveillance operation: Campbell in a green Cadillac, a black Windstar minivan owned by co-Defendant Matt Preston Stewart ("Stewart"), a white Cadillac registered to Holmes, a tan Explorer in which co-Defendant Rodney Rudy Sierz ("Sierz") was a passenger, and a red pickup truck driven by co-Defendant Tracy Jobie Nelson ("Nelson").

At approximately 1:20 p.m. on September 14, 2007, members of the surveillance team began their investigation at 6700 Iowa Street, Campbell's residence. The team observed Campbell exit his home with Quentisha White and leave in the green Cadillac. Neither individual carried anything. This led Special Agent Anthony Hartman ("SA Hartman") of the Federal Bureau of Investigation ("FBI") to believe Campbell and White would get drugs from another location.

Agents from the surveillance team followed Campbell from Iowa Street to 12666 Mendota, an address unknown to agents before then.

Campbell and White remained at 12666 Mendota for 3-5 minutes. None of the agents observed: (1) them get out of their car; (2) anyone approach their car; (3) drugs; or (4) a drug transaction.

Nevertheless, Deputy Burnon Lilly of the Wayne County Sheriff's Department

was "directed" to "pull over" Campbell.

### B. Traffic Stop of Campbell and the Green Cadillac

Deputy Lilly pulled Campbell over at approximately 2:20 p.m. Corporal David Rahn of the Wayne County Sheriff's Department arrived at the traffic stop at approximately 2:40 p.m. with his drug-sniffing dog, "Chief." Chief sniffed the exterior and interior of the car. Chief "alerted" inside the Cadillac near the front passenger seat, and Deputy Lilly retrieved a black plastic bag that contained a kilogram of cocaine.

### C. Surveillance of Holmes in the White Cadillac and Seizure of Cocaine from Sierz in the Tan Explorer

Special Agent Paul Sorce ("SA Sorce") of the FBI and SA Hartman began surveillance on 12666 Mendota at approximately 2:45 p.m., during Campbell's traffic stop. Besides the green Cadillac that had come and gone, SA Hartman observed Stewart's minivan parked on the street in front of 12666 Mendota. Stewart has weapons and/or narcotic convictions, and the agents believed he had a connection to 12666 Mendota.

There was also a white Cadillac parked in the rear of the house. A plate check on the white Cadillac determined it was registered to Holmes, who has drug convictions.

Holmes and Stewart left 12666 Mendota in the white Cadillac. While SA Hartman watched 12666 Mendota, SA Sorce followed the white Cadillac to a transmission ship on Warren Avenue. SA Sorce then followed it to BT's Club on Michigan Avenue in Dearborn, where it remained for approximately 45 minutes. Holmes and Stewart left BT's Club and returned to 12666 Mendota at approximately 4:48 p.m.

4

While Holmes and Stewart were at BT's Club, SA Hartman notified SA Sorce that a tan Explorer parked on the street directly in front of 12666 Mendota and behind Stewart's minivan at approximately 4:28 p.m. Kelly Jo Lamero was the driver of the Explorer, and Sierz was in the passenger seat on the phone.

When Holmes and Stewart returned to 12666 Mendota, Holmes pulled all the way into the driveway, and the Explorer followed. Both vehicles were out of the agents' sight.

No one saw: (1) either individual exit the Explorer; (2) anyone from the Mendota address approach the Explorer; or (3) either individual in the Explorer have contact with Stewart's minivan.

The Explorer backed out of the driveway 4-5 minutes later. The Livonia Police Department stopped it on I-96 near the Levan exit at approximately 5:00 p.m, and Lamero, the owner, consented to its search. Investigator Art Wimmer of the DPD searched the Explorer and found a plastic bag behind the driver's seat. Inside the plastic bag was a shoe box. Inside the shoe box was a "brick" of cocaine.

### D.   Surveillance of Parking Lot and Seizure of Cocaine from Nelson's Red Pickup Truck

SA Hartman observed Stewart leave the Mendota address shortly after the Explorer left. Stewart did not carry anything from the house to his minivan.

SA Hartman followed Stewart to the parking lot of a Family Dollar Store on the corner of Joy Road and Evergreen. Stewart got into the passenger seat of Nelson's red pickup truck. Stewart soon left in his own minivan.

No one observed drugs, packages, or a drug transaction during the entire

surveillance of the parking lot. Nevertheless, SA Hartman believed a drug transaction occurred based on his training and experience.

Officer Michael Garrison of the DPD met SA Hartman on West Chicago. SA Hartman directed Garrison to: (1) conduct a traffic stop of Nelson's pickup truck when he had probable cause; (2) identify the driver; and (3) look for a package.

Officer Garrison stopped the truck on eastbound Joy Road. When Officer Garrison approached the truck, Nelson continuously questioned why he was stopped. Garrison smelled a strong chemical odor. Garrison described the smell as paint remover or an automotive smell. He said that odor is associated with narcotics, but it could have been a non-narcotic smell.

Based on Nelson's questioning and the chemical odor, Officer Garrison believed narcotics may be in the pickup truck. When asked, Nelson stepped out of the pickup truck. When Nelson cleared the doorway, Officer Garrison observed a tan color plastic shopping bag on the floor board behind the driver's seat. A clear Zip-Loc bag was sticking out of the shopping bag. Inside the Zip-Loc bag was a whitish color powdery substance. Officer Garrison went to the passenger side of the truck, opened the door, and seized the cocaine.

### E. Traffic Stop of Holmes and the White Cadillac

At approximately 6:00 p.m., Officer Pionessa received a call from a member of the Violent Crime Task Force. The agent directed Pionessa to conduct a traffic stop on the white Cadillac because Holmes was wanted in connection with the distribution of narcotics.

Officer Pionessa observed the car near East McNichols and Mt. Elliott. Officer

Martin's patrol car was behind it.  Pionessa was in his patrol car behind Officer Martin.

Sergeant Benito Mendoza ("SA Mendoza") had followed the white Cadillac from the transmission shop earlier.  He did not observe a violation.  It is unknown whether Officer Martin observed a civil infraction; he did not testify at the evidentiary hearing.

Officer Pionessa said he pulled Holmes over for not wearing a seat belt although Pionessa was unable to see: (1) a shoulder harness restraint; (2) a silver metal clasp recoiled into the harness; or (3) anything from the seat belt area near the driver's door.

Pionessa said he confirmed Holmes was not wearing a seat belt as he approached the car.  Pionessa said Officer Martin ordered Holmes out of the car for the officers' safety.  Pionessa's experience shows firearms are associated with narcotics.

When Holmes was out of the car, Officer Pionessa observed a large bulge on his right hip.  Pionessa recovered a loaded 9 mm H&K pistol and arrested Holmes for carrying a concealed weapon.

A video recording of the traffic stop is unavailable.  Officer Pionessa was unsure whether his patrol car was equipped with a video camera.  He was aware that a federal monitor requires traffic stops by the DPD to be videotaped.

### F.    Affidavit for Search Warrant

No member of the surveillance team observed contraband brought into or out of 12666 Mendota nor was a controlled purchase attempted at that address.  However, Deputy Donald Farris of the FBI and SA Malagrida began working on a search warrant affidavit for 12666 Mendota at approximately 3:00 p.m., while members of the surveillance team provided them additional information to include in the affidavit.

Deputy Farris swore to the affidavit at 36th District Court with the on-duty

magistrate.  No agent at the evidentiary hearing could remember the magistrate who signed the search warrant, and the signature on the warrant is illegible.  The warrant was signed at approximately 6:00 p.m.

### G. Execution of the Search Warrant at 12666 Mendota

SA Sorce, SA Malagrida, Deputy Farris, and Investigator Wimmer executed the search warrant at approximately 7:00 p.m.  They found $172,000.00 in cash, two handguns, several kilograms of cocaine, packaging material, scales, cell phones, documents that had Holmes's name with the 12666 Mendota address, and documents that had Stewart's name with a different address.

On September 25, 2007, Holmes was charged with: (1) Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) five counts of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §841(a)(1).

## III. APPLICABLE LAW AND ANALYSIS

### A. Did Officer Pionessa have Probable Cause to Believe Holmes was not Wearing a Seat Belt?

Officer Pionessa's decision to conduct a traffic stop is reasonable and complies with the Fourth Amendment guarantee against "unreasonable" searches and seizures if he had probable cause to believe Holmes committed a traffic violation.  *See Whren v. United States*, 517 U.S. 806, 810 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (*per curiam*)).  Probable cause means "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.

1993) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).

The Government has the burden to prove the traffic stop was based on probable cause. *United States v. Walters*, 492 F.Supp.2d 754, 758 (W.D. Mich. 2007) (citing *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987)). To determine if the Government met this burden, the Court scrutinizes Officer Pionessa's testimony to see if it is credible. *See United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999); *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999).

Holmes asks the Court to discredit Officer Pionessa's testimony because: (1) the traffic stop was planned before Pionessa saw the white Cadillac; (2) Pionessa was not certain that he observed a civil infraction; (3) the Government does not have video surveillance of the alleged civil infraction although all traffic stops by the DPD are supposed to be videotaped; (4) Officer Martin did not corroborate Pionessa's testimony; and (5) SA Mendoza did not observe a civil infraction.

It does not matter that the traffic stop was pre-planned. If probable cause exists, an officer may stop a vehicle for a civil infraction even when his true motivation for the stop is to search for contraband. *Hill*, 195 F.3d at 264 (citing *Whren*, 517 U.S. at 812-13). The officer's knowledge or suspicions about the traffic violator at the time of the stop is irrelevant. *Ferguson*, 8 F.3d at 391. Simply put, "traffic stops based on probable cause, even if other motivations existed, are not illegal." *Id.* at 392.

To see into Holmes's car, Officer Pionessa had to look through: (1) his front windshield; (2) the rear windshield of Officer Martin's patrol car (which the Court assumes has a cage between the front and back seats); (3) the front windshield of Officer Martin's patrol car; and (4) the rear windshield of Holmes's car. Indeed, Officer

9

Pionessa testified that he could not see the seat belt area near the driver's side door.

In addition, some of Officer Pionessa's statements at the evidentiary hearing were certain: "[t]he defendant was not wearing a seat belt," while other statements contained uncertainty: "I *believe* there was no seat belt on the defendant."  (Emphasis added).

This record supports a finding that Officer Pionessa lacked probable cause to believe Holmes was not wearing a seat belt.

### B. Was an Investigatory Stop Justified Based on Reasonable Suspicion to Believe Holmes was Involved in a Drug Distribution Conspiracy?

Even if Officer Pionessa did not have probable cause to conduct a traffic stop, he had reasonable suspicion to conduct an investigatory stop of Holmes.

Law enforcement officers may conduct an investigatory stop if they have a "reasonable suspicion" that an individual committed a crime.  *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999) (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)).  Probable cause is not required.  *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (citations omitted).  Reasonable suspicion must be based on "a particularized and objective basis for suspecting the particular person . . . of criminal activity."  *Houston*, 174 F.3d at 813 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  The officer cannot base the investigatory stop on an ill-defined hunch, but must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop.  *Houston*, 174 F.3d at 813 (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *United States v. Erwin*, 155 F.3d 818, 822

10

(6th Cir. 1998)).

Agents did not observe a drug transaction during their entire surveillance of Holmes. However, Holmes resides at 12666 Mendota. A kilogram of cocaine was seized after Campbell left 12666 Mendota; and, a "brick" of cocaine was seized from Sierz when he left 12666 Mendota. Holmes was at 12666 Mendota with Stewart. Both have prior drug convictions. Stewart left 12666 Mendota to meet Nelson in a parking lot. Cocaine was seized from Nelson after his encounter with Stewart.

While Officer Pionessa did not personally participate in the surveillance of Holmes and his co-Defendants, reasonable suspicion may be satisfied by the collective knowledge of the police. *United States v. Townsend*, 330 F.3d 438, 441 (6th Cir. 2003).

Viewing the evidence in the light most favorable to the Government, and based on the totality of the circumstances, Officer Pionessa – through the agents' observations and information from a member of the Violent Crime Task Force that Holmes was wanted in connection with the distribution of narcotics – had at least reasonable suspicion to believe Holmes was involved in a drug distribution conspiracy.

Based on these findings, the Court need not address whether the agents had probable cause to believe Holmes was involved in a drug distribution conspiracy.

### C. Was the Search Warrant Supported by Probable Cause?

To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate "a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The magistrate's determination of probable cause is

11

afforded great deference. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "[S]o long as the magistrate had a 'substantial basis . . . for conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). Indeed, doubtful cases should be largely determined by the preference to be accorded warrants. *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965) (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

Nonetheless, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239.

The affidavit in support of the search warrant for 12666 Mendota says:

(1) A reliable confidential source ("CS1") told Task Force Agents: (a) an individual known as "Skip" is distributing multiple ounce quantities of cocaine in Detroit; (b) "Skip" is a black male, approximately 45-years-old, 5'9", approximately 160 pounds, with braided hair; (c) "Skip" resides at 6700 Iowa Street and drives a green Cadillac Eldorado; (d) he (or she) contacted "Skip" within the last 48 hours and "Skip" advised him (or her) he had kilograms of cocaine for sale for $25,000.00 per kilogram; and (e) "Skip" would distribute large quantities of narcotics on September 14, 2007.

(2) CS1's information is based on his (or her) own personal knowledge and observations.

(3) CS1 gave information in the past that led to the seizure of drugs.

(4) Task Force Agents showed CS1 a driver's license picture of Campbell, and CS1 identified the person in the photograph as "Skip."

(5) The DEA intelligence database says Campbell: (a) has an alias of "Skip"; (b) resides at 6700 Iowa Street; and (c) has drug convictions.

(6) Task Force Agents initiated surveillance at Campbell's residence, 6700 Iowa

Street, on September 14, 2007.

(7)  Campbell and a female left 6700 Iowa Street at approximately 1:45 p.m. in a green Cadillac. Campbell was wearing jogging pants with "SKIP" on one of the pant legs. Neither individual was carrying anything.

(8)  The green Cadillac went to 12666 Mendota for 3-4 minutes. Due to excessive traffic, no agent observed anyone exit the green Cadillac.

(9)  Wayne County Sheriff Deputies stopped the green Cadillac, and a search of the car yielded approximately one kilogram of cocaine.

(10) A DTE utility check of 12666 Mendota showed the bills are registered to "Threl Holmes" (this is an incorrect spelling of Holmes's first name).

(11) A check in the Michigan Department of Corrections showed "Threl Holmes" has narcotics and weapons convictions (the Government seems to concede Holmes does not have weapons convictions).

(12) At approximately 2:45 on September 14, 2007, a white Cadillac was parked in the rear of 12666 Mendota. A Michigan Secretary of State search showed the white Cadillac is registered to "Threl Holmes" at 12666 Mendota.

(13) A van was parked in front of 12666 Mendota registered to Stewart, who has a cocaine conviction.

(14) Two black males exited 12666 Mendota at approximately 3:15 and left in the white Cadillac.

(15) Based on training and experience, narcotics traffickers are known to store narcotics and subsequent proceeds obtained from the sale of narcotics in various covert locations, and will have firearms in such locations or on their person to protect their assets. Based on information provided by CS1, the narcotics present inside of the vehicle were packaged for sale and/or distribution, and activities consistent with narcotics sales.

(16) Affiant believes that probable cause exists to enter this residence to recover evidence of narcotics trafficking and/or money laundering activities.

Holmes says the evidence seized from 12666 Mendota should be suppressed because the affidavit: (1) does not establish a sufficient nexus between 12666 Mendota and evidence of drug trafficking; and (2) does not provide information about CS1's

13

reliability and credibility, nor does it provide evidence of corroboration. Holmes relies on *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005) and *United States v. Woosley*, 361 F.3d 924 (6th Cir. 2004).

Further, the Court notes that certain information in the affidavit should have been considered completely immaterial by the magistrate in making the probable cause determination: (1) the utility bills for 12666 Mendota are registered to Holmes; (2) Holmes's white Cadillac was parked at his own home; and (3) two black males left 12666 Mendota in Holmes's Cadillac.

There is also no support for the conclusion that agents could not observe anyone exit the green Cadillac due to "excessive traffic."

### 1. Sufficient Nexus

The issue for the Court to consider then, is whether the remainder of the affidavit establishes a nexus between 12666 Mendota and evidence of narcotics trafficking. *See United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (citations omitted). "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

In *Frazier*, a case relied on by Holmes, the affidavit details the defendant's drug-dealing enterprise; recounts a report of an anonymous cooperating witness who saw the defendant selling drugs out of a housing project; and, describes "controlled buys" between a confidential informant and members of defendant's enterprise. *Frazier*, 423 F.3d at 530. The Sixth Circuit held a nexus did not exist between the defendant's

14

residence (the place to be searched) and drugs (the evidence to be seized) because: (1) neither the anonymous cooperating witness nor the confidential informant witnessed the defendant dealing drugs from his residence; (2) the defendant's status as a drug dealer, standing alone, does not give rise to a fair probability that drugs will be found in his home; and (3) the warrant affidavit was based almost exclusively on the uncorroborated testimony of unproven confidential informants.  *Id.* at 532-33.

The affidavit in this case is similar to the one in *Frazier*.  Neither affidavit says the defendant was observed dealing drugs from his residence.  In fact, neither the agents nor CS1 observed Holmes dealing drugs from any location.  The only material information concerning Holmes is that he has narcotics convictions and lives at 12666 Mendota.

Nevertheless, the affidavit in this case goes farther to establish a nexus between 12666 Mendota and drugs.  The affidavit says Campbell would distribute large quantities of narcotics on September 14, 2007, Campbell was not carrying a package when he left his home on Iowa Street to go to 12666 Mendota, where he remained briefly.  Campbell was continuously under surveillance, made no other stops, and was stopped shortly after leaving 12666 Mendota.  A kilogram of cocaine was found in his car.  In addition, Stewart's minivan was parked in front of 12666 Mendota, and he has a cocaine conviction.

It is possible that Campbell did not receive the kilogram of cocaine from 12666 Mendota; he could have put it in his car before the agents began surveillance on Iowa Street.  However, Holmes does not cite case law to support the proposition that agents must exclude all possible explanations concerning the source of drugs before they can

receive a valid search warrant. In *United States v. Delguyd*, 542 F.3d 346 (6th Cir. 1976), the Sixth Circuit said, "it is not necessary to eliminate all but one possible explanation in order to establish probable cause, so long as the explanation advanced . . . to support the search appears in all probability to be correct." *Delguyd*, 542 F.2d at 351.

Further, while the affidavit does not say agents observed drugs or evidence going into or out of 12666 Mendota, probable cause only requires a "probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 244 n.13.

Based on the totality of the circumstances, the affidavit provides a substantial basis for the magistrate to believe evidence of drug trafficking would be found at 12666 Mendota.

### 2.    CS1's Reliability and Credibility

When hearsay information from a confidential informant is included in the affidavit, the Court considers the "veracity, reliability, and the basis of knowledge for that information" as part of the totality of the circumstances analysis. *See Frazier*, 423 F.3d at 532 (quoting *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003)). An affidavit that includes a tip from a reliable informant may support a finding of probable cause absent any corroboration. *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004) (citing *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000); *United States v. Smith*, 182 F.3d 473, 478-79 (6th Cir. 1999)). An affidavit that supplies little information about an informant's reliability may support a finding of probable cause if it includes sufficient corroborating information. *Woosley*, 361 F.3d at 927 (citing *Gates*, 462 U.S. at 241-45;

*United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000)).

Here, the affidavit says CS1 is a reliable confidential source who based his (or her) information on personal knowledge or observations. CS1 also gave information in the past that led to the seizure of drugs. This may be sufficient information to support a finding of probable cause absent corroboration.

Nevertheless, agents independently verified the information CS1 provided using the DEA intelligence database, a driver's license picture, and surveillance.

While the affidavit does not contain details about the cases CS1 provided information about in the past (e.g., dates, times, places, case numbers), "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Based on the totality of the circumstances, including the affiant's "training and experience," the affidavit in support of the search warrant established probable cause. *See United States v. Schultz*, 14 F.3d 1096, 1097 (6th Cir. 1994) (an officer's "training and experience" may be considered in determining probable cause) (citing *Texas v. Brown*, 460 U.S. 730, 742-43 (1983); *United States v. Martin*, 920 F.2d 393, 399 (6th Cir. 1990)).

**D.   Did the Agents have a "Good Faith" Basis to Believe the Search Warrant was Supported by Probable Cause?**

The "good faith" exception established in *United States v. Leon*, 468 U.S. 897 (1984) says evidence is admissible – although the search warrant lacked probable cause – if the agents performed the search in reasonable, good-faith reliance on the

search warrant. *Leon*, 468 U.S. at 913.

Holmes says the "good faith" exception does not apply because the affidavit was "so lacking in indicia of probable cause" as to render belief in its existence entirely unreasonable. *See Leon*, 468 U.S. at 923.

The Court disagrees.

Affidavits that are "so lacking in indicia of probable cause" only contain "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge[.]" *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). To determine whether an affidavit is "so lacking in indicia of probable cause," the Court uses a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place. *See Laughton*, 409 F.3d at 748 (quoting *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004)). The question is whether a "reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Frazier*, 423 F.3d at 536 (quoting *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)).

This affidavit is not based on the affiant's suspicions, beliefs, or conclusions. Instead, it establishes at least some connection between 12666 Mendota and drug trafficking. It also says CS1 is reliable because CS1 gave information in the past that led to the seizure of drugs.

Even if the affidavit lacked sufficient probable cause to support the search warrant, it was not so lacking in probable cause as to render agents' belief in its existence entirely unreasonable.

18

### E. Was the Search Warrant Signed by a Neutral and Detached Magistrate?

At the evidentiary hearing, no agent could remember the name, gender, or race of the magistrate who signed the search warrant. They also could not decipher the signature on the search warrant.

However, the Government attached to its "Supplemental Brief in Opposition to Defendants[sic] Supplemental Brief after Evidentiary Hearing" an Affidavit from Magistrate Millicent D. Sherman from the 36th District Court. The Affidavit says:

> I, Millicent D. Sherman, am a Magistrate at the 36th District Court in Detroit, Michigan. On September 14, 2007, I was so employed in that capacity when I reviewed the search warrant identified with the reference number 36-07-826500. The signature at the bottom of the warrant is mine and issued the same.

The Court is satisfied that the search warrant was signed by a neutral and detached magistrate.

## IV. CONCLUSION

The Court **ADOPTS** the Magistrate Judge's R&R. Holmes's motion to suppress is **DENIED**.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: January 16, 2009

19

> The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 16, 2009.
>
> s/Carol A. Pinegar
> Deputy Clerk